IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CHARLES E. BROWNLEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV642 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Charles E. Brownlee ("Plaintiff") brought this action pursuant to § 205(g) of

the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review

of a final decision of the Commissioner of Social Security denying his claim for Disability

Insurance Benefits under Title II of the Act. The parties have filed cross-motions for

judgment, and the administrative record has been certified for review.

I.  PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits in October of 2014,

alleging a disability onset date of August 4, 2014. (Tr. at 12, 152-160.)[2] His application was

denied initially (Tr. at 78-81) and upon reconsideration (Tr. at 85-92). Thereafter, Plaintiff

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 150-151.) Plaintiff, along with his attorney and a vocational expert, attended the subsequent hearing on May 30, 2017. (Tr. at 25.) The ALJ ultimately concluded that Plaintiff was not disabled under the Act from his alleged onset date of August 4, 2014 through August 1, 2017, the date of the ALJ's decision. (Tr. at 20.) On May 23, 2018, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

## II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue . . . is not whether [a claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step

determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179. Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" during the period since his alleged onset date of August 4, 2014. Plaintiff therefore

met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> epicondylitis, neuropathy, degenerative joint disease, degenerative disc disease, obesity, and bilateral patella alta.

(Tr. at 15.) The ALJ found at step three that these impairments did not meet or equal a listing. (Tr. at 16.) Plaintiff does not challenge this listing determination at step three. The ALJ then assessed Plaintiff's RFC and determined that he could perform light work

> except the claimant can occasionally climb ramps and stairs and never climb ladders, ropes, and scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl, and never work around hazardous machinery, unprotected heights, or with vibrating equipment. The claimant can frequently handle bilaterally and occasionally finger bilaterally. The claimant cannot be exposed to concentrated extreme hot or cold temperatures.

(Tr. at 16.) Based on the RFC determination, the ALJ found under step four of the analysis that Plaintiff could not perform his past relevant work, that is, medium, skilled work as a machinist. (Tr. at 19.) The ALJ then determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in the national economy. (Tr. at 19-20.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 20.)

Plaintiff now argues that the ALJ erred in two respects. First, Plaintiff contends that the ALJ erred in her RFC assessment because she "either failed to explain how severe impairments limited his function or failed to acknowledge impairments entirely." (Pl. Br. [Doc. #10] at 7.) Second, Plaintiff challenges the ALJ's assessment of his subjective complaints, contending that "the ALJ erroneously rejected his mother's statement, failed to

consider the extent of his activities, and failed to consider both his response and access to medication." (Id. at 18.)

A. RFC

Plaintiff first contends that the ALJ's RFC assessment is "unexplained and incomplete." (Pl. Br. at 4.) As explained below, this challenge lacks merit.

"RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require the RFC to reflect a claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

Here, the ALJ's assessment of Plaintiff's RFC is both susceptible to judicial review and supported by substantial evidence. First, as noted, the ALJ determined that Plaintiff suffered from the following severe impairments: epicondylitis, neuropathy, degenerative joint disease, degenerative disc disease, obesity, and bilateral patella alta. (Tr. at 15.)

Second, the ALJ then pointed to sufficient objective medical evidence to support her RFC determination. (Tr. at 21-24.) For example, the ALJ noted that at Plaintiff's consultative examination, in November of 2014, he did not have a cane despite reporting that he needed

one; he appeared comfortable sitting; he displayed some L3-4 paraspinal muscle tenderness, but otherwise no spinal tenderness or spasms; he could squat; he had normal lower extremity strength; and he could rise both sitting and supine without difficulty, though his gait was somewhat slow and deliberate. (Tr. at 17, 285-287.) The ALJ also pointed to a 2015 MRI of Plaintiff's cervical spine showing degenerative changes, but with generally mild findings[3] (Tr. at 17, 389), as well as a 2016 MRI of the spine showing only mild central spinal stenosis at L4-5, and moderate disc space narrowing at L5-S1 (Tr. at 17, 406-407). The ALJ also pointed to a 2016 finding of full range of motion of the elbows and wrist (Tr. at 17, 294-295) and another 2016 finding in which Plaintiff demonstrated normal gait and station (Tr. at 17, 315). The ALJ next pointed to a 2017 MRI of the right elbow showing mild to moderate lateral epicondylitis, and an MRI of the left elbow that was normal. (Tr. at 402-404.) The evidence to which the ALJ pointed is consistent with and demonstrative of the overall longitudinal record that regularly showed that Plaintiff had full range of motion of the upper extremities, "5/5" strength, normal coordination, and intact fine finger movements. (Tr. 17, 294, 331, 345, 347, 352, 358, 362, 365, 369, 377, 381, 384, 389-90, 396, 399.)

---

[3] Plaintiff faults the ALJ for characterizing the findings of this MRI as "generally mild," arguing that the MRI reflects "moderate foraminal stenosis at C7." (Pl. Br. at 5 referencing Tr. at 389.) Upon review of this exhibit, the Court does not see any error in the ALJ's characterization. The MRI reflects at C2-3 "minimal degenerative changes" and central canal and neural foramina "adequate in size"; at C3-4 a "tiny posterior central disc herniation" and central canal and neural foramina "adequate in size"; at C4-5 a "small posterior disc herniation" and "adequate" central canal and neural foramina; at C5-6 and C6-7 "narrowing of the disc space and mild spondylotic change" and central canal "low adequate in size" with "moderate narrowing [that] involves both neural foramina"; and at C7-T1 central canal and neural foramina "adequate in size". (Tr. at 389.) Describing this MRI as "generally mild" is not a mischaracterization or basis for remand. Indeed, the lumbar MRI similarly showed "mild central spinal stenosis at L4-5 and moderate disc space narrowing at L5-S1" as specifically noted by the ALJ (Tr. at 17), and the ALJ also characterized the imaging of the lumbar spine as "generally mild." (Tr. at 18.) Thus, the ALJ used the "generally mild" description even while acknowledging some moderate disc space narrowing, and the characterization is not inconsistent with the moderate narrowing at C5-6 and C6-7.

The ALJ also pointed to the medical opinions of the non-examining state agency physicians, whose opinions she concluded were "consistent with the record." (Tr. at 18.) Specifically, Dr. Robert Pyle initially determined that Plaintiff could perform light work with postural limitations and environmental limitations. (Tr. at 57-66.) Dr. Dakota Cox conducted the reconsideration and also concluded that Plaintiff could perform light work with postural and environmental limitations. (Tr. at 68-75.) The ALJ observed that both opinions were generally consistent with the record, however, she only afforded these opinions "some weight" because she concluded that they did not adequately account for "the claimant's elbow and radiculopathy symptoms, which limit his upper extremity functioning." (Tr. at 18.) Consequently, the ALJ essentially adopted the limitations set forth by Drs. Pyle and Cox, but also added manipulative limitations to the RFC determination by restricting Plaintiff to only frequent handling and only occasional fingering. (Tr. at 16.)

Next, in determining Plaintiff's RFC, the ALJ further relied upon Plaintiff's activities of daily living, which included the performance of household chores, walking for exercise,[4] working in the yard, looking for work, preparing simple meals, washing laundry, doing light repair work, driving, shopping, handling his own money, paying attention for as long needed, spending time with family and friends, and completing what he started. (Tr. at 15, 18, 230-237.) In light of all this, and notwithstanding Plaintiff's arguments to the contrary, the Court concludes that the ALJ's decision to limit Plaintiff to light work with additional postural,

---

[4] Plaintiff contends that the ALJ erred by not indicating how long he was able to walk and run and that as a result his efforts to lose weight do not support the RFC determination. (Pl. Br. at 9-10.) However, the fact that Plaintiff walked and ran for exercise is relevant evidence in the ALJ's overall analysis.

manipulative, and environmental limitations was supported by substantial evidence, and the ALJ provided sufficient explanation to allow for judicial review.

### i.    Manipulative Limitations

In challenging the ALJ's determination, Plaintiff contends that the ALJ's "evaluation of [his] manipulative limitations is not supported by substantial evidence." (Pl. Br. at 4.) However, this is not a case where the ALJ failed to include any manipulative limitations in the RFC. As noted, the ALJ here specifically discounted the opinion of the non-examining state agency physicians and added manipulative limitations to the RFC, finding that Plaintiff was limited to only occasional fingering and only frequent handling. (Tr. at 16.) Nor is this a case where the claimant contends that the medical evidence necessarily compelled the ALJ to find more restrictive manipulative limitations. Rather, Plaintiff here contends that the ALJ failed to adequately build a logical bridge between the evidence of record and her findings, particularly as to Plaintiff's degenerative disc disease, radiculopathy, elbow pain on extension, hand tremors, and decreased hand sensation. (Pl. Br. at 4-7; Pl. Reply [Doc. #13] at 1-4.) However, the ALJ found Plaintiff's epicondylitis (tennis elbow), neuropathy, and cervical spine degenerative disc disease severe at step two and then proceeded to discuss these impairments and Plaintiff's radiculopathy at the RFC stage, based on the review of the medical evidence, the opinion evidence, and Plaintiff's activities as discussed above.[5] (Tr. at 17-18.) The ALJ also noted that, while Plaintiff had elbow pain, he retained full range of motion of the elbow

---

[5] Plaintiff implies that the ALJ erred by not finding his radiculopathy a severe impairment at step two. (Pl. Br. at 4.) Any error is harmless given the presence of other identified severe impairments at step two and the fact that the ALJ later evaluated Plaintiff's radiculopathy. (Tr. at 17-18.) See, e.g., Young v. Astrue, No. 1:09CV1008, 2013 WL 474787, at *10 (M.D.N.C. Feb. 7, 2013); Garofolo v. Colvin, No. 1:14CV761, 2016 WL 1092650, at *4 (M.D.N.C. Mar. 21, 2016).

and wrists, and the record reflected conservative treatment measures with "anti-inflammatory medications, bracing, icing, and stretching." (Tr. at 17, 294-295.)

Plaintiff faults the ALJ for failing to specifically discuss examination notes showing decreased pinprick sensation in his fingers and hand tremors (Pl. Br. at 5-6 referencing Tr. at 375, 377, 381, 384.) However, these examination notes also demonstrated normal fine finger movements and full strength. (Tr. at 377, 381, 384, 389-90, 396, 399.) To the extent Plaintiff faults the ALJ for failing to specifically discuss some part of those examination notes, the Court does not see any material error given that the ALJ considered the records and considered and discussed Plaintiff's hand and arm impairments in formulating the RFC, with restrictions on Plaintiff's ability to lift, carry, handle, and finger, as well as multiple environmental limitations.[6] As noted by Defendant, an ALJ does not have an obligation to discuss or refer to each piece of evidence in the record. See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) ("While the Commissioner's decision must 'contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the

---

[6] Plaintiff also specifically faults the ALJ for failing to discuss an EMG nerve conduction study reflecting "chronic C7 radiculopathy" (Pl. Br. at 5 citing Tr. at 375.) Plaintiff then speculates how the C7 radiculopathy would explain his symptoms. (Id.) However, the examination note by Plaintiff's neurologist states:

> Cramping and numbness in both hands. EMG nerve conduction velocity was reviewed with chronic C7 radiculopathy which does not explain his symptoms. He also has been evaluated for possible underlying peripheral neuropathy noted on examination. Work up for PN was positive for the punch skin biopsy. Stable symptoms.

(Tr. at 377 (emphasis added).) To the extent that Plaintiff's neurologist noted peripheral neuropathy, the ALJ found that Plaintiff's neuropathy was a severe impairment at step two, and as set out above, the ALJ considered the medical evidence, the opinion evidence, the conservative treatment, and Plaintiff's activities in formulating an RFC, and the Court does not find any material error in the ALJ's analysis. The Court also notes that any alleged error in failing to include a limitation for "feeling" would appear to be harmless in any event, given that the DOT descriptions for the jobs the ALJ concluded Plaintiff could perform do not require feeling. (Tr. at 20.) See Counter Clerk, 249.366-010, 1991 WL 672323 ("Feeling: Not Present - Activity or condition does not exist"); Shipping-And-Receiving-Weigher, 222.387-074, 1991 WL 672108 (same); Car-Wash Attendant, Automatic, 915.667-010, 1991 WL 687869 (same).

Commissioner's determination and the reason or reasons upon which it is based,' 42 U.S.C. § 405(b)(1), there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." (quotation omitted)). Ultimately, the ALJ made a determination supported by substantial evidence in the record and with sufficient analysis to explain the determination and allow for judicial review, and the Court will not re-weigh conflicting evidence or substitute its judgment for that of the ALJ.

### ii. Light Work with Additional Limitations

Plaintiff next contends that "[t]he ALJ's finding that [he] can perform a range of light work is not supported by substantial evidence." (Pl. Br. at 7.) This argument is also unpersuasive. As explained at length above, Plaintiff demonstrated normal strength in the lower extremities, no difficulties squatting or raising from a seated position, and normal gait and station (Tr. at 17, 286-287, 291, 299, 308, 315, 325, 337); the non-examining state agency physicians concluded that he could perform light work with additional limitations (Tr. at 18, 57-66. 68-77); and Plaintiff performed significant activities of daily living (Tr. at 15-18, 230-237). The ALJ's analysis is supported by substantial evidence.

Plaintiff faults the ALJ for relying on the non-examining state agency physicians, who did not have access to the imaging and treatment notes for the later time period after they had completed their review. (Pl. Br. at 7-8; Pl. Reply at 4.) However, the ALJ considered all of the evidence, including the state agency physicians' conclusions and the additional evidence in the record, and made a legal determination as to what Plaintiff could do despite his limitations. 20 C.F.R. § 404.1545, § 404.1546, § 404.1527(d)(2). Plaintiff also argues that the ALJ did not sufficiently discuss his degenerative disc disease, his bilateral patella alta, a Baker's cyst/Hoffa's

cyst, occasions in which he demonstrated decreased pinprick sensation and neuropathy, and other evidence related to his lower extremities. (Pl. Br. at 8-9; Pl. Reply at 5.) However, the ALJ specifically included Plaintiff's degenerative disc disease, degenerative joint disease, bilateral patella alta, and neuropathy as severe impairments at step two, and included the swelling in Plaintiff's knee (specifically in the Hoffa's fat pad) in setting the RFC. (Tr. at 15, 17-18). The ALJ discussed the medical records related to Plaintiff's lower extremities, and noted that the records reflected that Plaintiff had generally normal lower extremity function. (Tr. at 17-18, 286, 291, 299, 308, 325, 337.) The ALJ also specifically considered the conservative treatment recommendations, and noted that Plaintiff's "orthopedist recommended a stronger anti-inflammatory and possibly a compressive knee sleeve." (Tr. at 18, 292).[7] The ALJ ultimately included limitations on Plaintiff's ability to lift and carry weight and perform postural maneuvers. (Tr. at 16.) To the extent Plaintiff faults the ALJ for failing to specifically discuss some part of these examination notes, the Court does not see any material error given that the ALJ considered the records and considered and discussed Plaintiff's lower extremity impairments in formulating the RFC. Finally, Plaintiff contends that the ALJ failed to explain how his severe impairments were consistent with the demands of light work, including standing and/or walking up to six hours a day. (Pl. Br. at 9-10.) Nevertheless, as explained above in detail, the ALJ's assessment of the medical records, the

---

[7] In that treatment record, the orthopedist does not indicate that Plaintiff's knee impairment would preclude Plaintiff from working or engaging in activities, and instead states that he "encouraged [Plaintiff] to ice his knee following activities or work as this will be very beneficial." (Tr. at 292.)

opinions of the non-examining state agency physicians, and Plaintiff's activities of daily living are substantial evidence in this regard.

### iii. Obesity

Plaintiff next contends that "the ALJ's evaluation of [his] obesity is not supported by substantial evidence." (Pl. Br. at 10.) The procedure for assessing obesity as an impairment in disability claims is described in Social Security Ruling ("SSR") 02-1p: Titles II and XVI: Evaluation of Obesity, 2002 WL 34686281 (Sept. 12, 2002).[8] SSR 02-1p requires a consideration of obesity at various points in the five-step analysis. (Id.) At step two, SSR 02-1p provides that obesity, like any other medical condition, "is a 'severe' impairment when, alone or in combination with any other medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." (Id. at *4.) SSR 02-1p also provides that:

> [t]here is no specific level of weight or BMI that equates with a "severe" or a "not severe" impairment. Neither do descriptive terms or levels of obesity (e.g. "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

SSR 02-1p, 2002 WL 34686281 at *4 (Sept. 12, 2002). The ALJ must also "explain how [she] reached [ ] conclusions on whether obesity caused any . . . limitations." Id. at *7.

---

[8] The Court notes that on May 20, 2019, SSR 02-1p was rescinded and replaced by SSR 19-2p. Both SSR 02-1p and SSSR 19-2p provide guidance regarding the evaluation of obesity in disability claims under Titles II and XVI. In this case, the Court has cited to SSR 02-1p, in effect at the time of the ALJ's decision.

Here, the ALJ explicitly considered Plaintiff's obesity. At step two, she found that Plaintiff's obesity was a severe impairment. (Tr. 15.) At step three, she also discussed Plaintiff's obesity, explaining that "[t]he undersigned also has considered obesity under SSR 02-1p. The current evidence, however, fails to establish an impairment that is accompanied by signs that are reflective of listing-level severity." (Tr. at 16.) The ALJ also explicitly mentioned Plaintiff's efforts to lose weight in assessing his RFC, including that Plaintiff was walking more. (Tr. at 17, 324.)

In addition, the ALJ explained that she considered the entire record (Tr. at 16, 18) and also explained that she relied on the opinions of the non-examining state agency physicians (Tr. at 18). Both physicians acknowledged evidence of Plaintiff's obesity in the record, specifically referencing Plaintiff's "stout body habitus" as described by the consultative examiner (Tr. at 57, 60, 61, 64, 68, 71, 74), but ultimately determined that Plaintiff was capable of performing light work with some postural and environmental limitations (Tr. at 64, 75), which is generally consistent with the ALJ's RFC determination (Tr. at 16). Furthermore, as part of the review of evidence and determination of the RFC, the ALJ also referenced medical reports that included acknowledgement of Plaintiff's obesity. (Tr. at 17-18, 299, 308-309, 324, 389.) The ALJ then considered the recommended treatment and Plaintiff's activities in determining the extent to which Plaintiff's impairments, in combination, resulted in limitations in the RFC. In the circumstances, it does not appear that the ALJ's failure to further discuss obesity at step four would require remand here. Indeed, Plaintiff "has not pointed to any specific evidence supporting an allegation that [his] obesity actually causes [him] additional functional limitations or pain." Graham v. Colvin, No. 3:14-CV-27280, 2015 WL 7752620, at

*21 (S.D.W. Va. Nov. 13, 2015); see also Elrod v. Berryhill, No. 1:16CV1171, 2017 WL 3976626, *10 (M.D.N.C. Sep. 7, 2017) (finding that remand was not required where "Plaintiff refers to no limitations related to obesity for which the ALJ failed to account for with a reduced range of light work" and where the ALJ considered the medical records and "reports throughout Plaintiff's medical records recognize Plaintiff's obesity or weight, but no report expressed concerns of great limitations as a result of her weight.").

     iv. Concentration, Persistence, and Pace

Plaintiff also contends that the ALJ materially erred in evaluating his ability to maintain pace. (Pl. Br. at 13.) In Mascio v. Colvin, the Fourth Circuit held that if moderate limitations in concentration, persistence, or pace ("CPP") are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. 780 F.3d 632, 637-638 (4th Cir. 2015). The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in [CPP] at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the [CPP] limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted).

In the present case, unlike in Mascio, the ALJ found no limitation in any functional area, except for the domain of CPP, in which Plaintiff was mildly limited. (Tr. at 15.) More importantly, the ALJ made these findings in the course of her discussion at step two of the sequential analysis, in which she found that Plaintiff's mental impairment of depression "does not cause more than minimal limitation in the claimant's ability to perform basic mental work

activities and is therefore nonsevere." (Tr. at 15); see 20 C.F.R. § 404.1520a(d)(1) (providing that if the degree of limitation in the functional areas is only "none" or "mild," the impairment is not severe, unless the evidence otherwise indicates a more than minimal limitation in the ability to do basic work activities). This analysis differs from the typical Mascio scenario, in which the ALJ, having already identified one or more mental impairments as severe at step two, then performs a step three evaluation as to whether the degree of functional limitation resulting from Plaintiff's mental impairment(s) meets or equals a listed impairment. In that scenario, the resulting Mascio challenge stems from the ALJ's failure, or alleged failure, to include limitations from the claimants' severe impairments in the RFC.

This distinction is significant. "Basic work activities" are defined as functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, using judgment, responding appropriately to co-workers and supervisors, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b). Here, the ALJ found that Plaintiff's mental impairment of depression was nonsevere, meaning that it "do[es] not cause more than minimal limitation in [his] ability to perform basic mental work activities." (Tr. at 15.) Thus, the ALJ explained why there was no mental limitation in Plaintiff's RFC, based on the ALJ's determination that Plaintiff's mental impairment did not affect his ability to perform basic work activities. In the circumstances, Plaintiff's Mascio challenge is without basis.[9]

_____

[9] Plaintiff cites to McMichael v. Colvin, No. 1:15-CV-4556768, 2016 WL 4556768 (Aug. 31, 2016), in support of his contention. However, in that case, the Court found that the ALJ had failed to consider a mental disorders examination:

The C & P mental disorders examination, also conducted in September 2014, indicated that Plaintiff's mental disorder caused an occupational and social impairment which "reduced [Plaintiff's] reliability and productivity." Moreover, the following symptoms were checked: depressed mood; anxiety; panic

B.    Subjective Symptoms

Plaintiff next contends that substantial evidence fails to support the ALJ's evaluation of his subjective complaints. (Pl. Br. at 15-18.) Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. In Craig v. Chater, the Fourth Circuit addressed the two-part test for evaluating a claimant's statements about symptoms. Craig, 76 F.3d at 594-95. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 594 (emphasis omitted) (citing 20 C.F.R. §§ 416.929(b), 404.1529(b)). If such an impairment exists, the second part of the test then requires the ALJ to consider all available evidence, including a claimant's statements about

---

attacks that occur weekly or less often; chronic sleep impairment; mild memory loss, such as forgetting names, directions or recent events; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or work like setting; impaired impulse control, such as unprovoked irritability with periods of violence. It was concluded at the end of the examination that Plaintiff's "[a]nxiety depression irritability and other mental health symptoms ha[d] increased ... [and] [m]ost symptoms noted above are now in the moderate range, occasionally moderately severe." Without discussing this evidence the ALJ determined that Plaintiff's adjustment disorder was non-severe. Id. (internal citations omitted). Thus, in that case, the ALJ's failure to include Plaintiff's mental impairment as a severe impairment at step two, and related failure to include any mental limitations in the RFC, was sufficiently explained and was not supported by substantial evidence in light of the un-mentioned mental examination. No such issues exist in the present case.

pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [the] ability to work." Craig, 76 F.3d at 595.

This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which a claimant's pain or other symptoms limit the ability to perform basic work activities. Relevant evidence for this inquiry includes a claimant's "medical history, medical signs, and laboratory findings" Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 404.1529(c)(3):

> (i) [Claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or [has] taken to alleviate [his] pain or other symptoms;
>
> (v) Treatment, other than medication, [claimant] receive[s] or [has] received for relief of [his] pain or other symptoms;
>
> (vi) Any measures [claimant] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

Where the ALJ has considered these factors and has heard a claimant's testimony and observed his demeanor, the ALJ's determination is entitled to deference. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

In the present case, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's

"statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 18.) Therefore, Plaintiff's challenge hinges on step two of the Craig analysis.

It is undisputed that at step two of the analysis, the ALJ should not reject a claimant's statements "about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. § 404.1529(c)(2). Thus, "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." Lewis v. Berryhill, 858 F.3d 858, 866 (4th Cir. 2017). However, it is also undisputed that a plaintiff's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities [only] to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Thus, objective medical evidence and other evidence in the record are "crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs [the] ability to work" and "[a]lthough a claimant's allegations about . . . pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [ ]he suffers." Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595); see also SSR 16-3p ("[O]bjective medical evidence

is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities . . . ."). According to the regulatory guidance:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p.

In the present case, a thorough review of the ALJ's decision and the record as a whole reveals that the ALJ properly considered objective medical evidence and other evidence, and explained that determination in the decision. In evaluating the evidence, the ALJ specifically identified multiple reasons supporting her determination.

First, the ALJ pointed to objective medical evidence in support of her decision—discussed in detail in Part A of this recommendation—to partially discount Plaintiff's subjective complaints. (Tr. at 21-24.) As noted, the evidence to which the ALJ pointed is consistent with and demonstrative of the overall longitudinal record that regularly demonstrated that Plaintiff had full range of motion of the upper extremities, "5/5" strength, normal coordination, and intact fine finger movements. (Tr. 17, 285-287, 294-295, 331, 345, 347, 352, 358, 362, 365, 369, 377, 381, 384, 389-90, 396, 399, 402-404, 406-407.)

Second, the ALJ found that while there was objective evidence that Plaintiff had some limitations, Plaintiff also testified that at the time of the hearing he only took over-the-counter

medication for the pain.    (Tr. at 18, 39.)  "Use of only over-the-counter pain medication is viable evidence that a plaintiff's testimony regarding her pain was not credible." <u>Muir v. Astrue</u>, No. CIV. SKG-11-2041, 2013 WL 140779, at *8 (D. Md. Jan. 3, 2013).

Third, the ALJ also accurately pointed out that the only treatment prescribed for Plaintiff was conservative in nature. (Tr. at 18.)  It is well-settled that conservative treatment is one of several valid reasons to discount a claimant's subjective statements regarding allegedly debilitating pain. <u>See</u> <u>Stitely v. Colvin</u>, 621 F. App'x 148, 151 (4th Cir. 2015); <u>see also</u> <u>Smith v. Colvin</u>, 756 F.3d 621, 626 (8th Cir. 2014); <u>Wall v. Astrue</u>, 561 F.3d 1048, 1068-69 (10th Cir. 2009); <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039-40 (9th Cir. 2008).

Fourth, the ALJ noted further that Plaintiff's activities of daily living were inconsistent with his allegations of complete disability.  (Tr. at 15, 18.)   When assessing a Plaintiff's subjective complaints, "[a]n ALJ may not consider the <u>type</u> of activities a claimant can perform without also considering the <u>extent</u> to which she can perform them." <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (citing <u>Brown v. Comm'r Soc. Sec. Admin.</u>, 873 F.3d 251, 263 (4th Cir. 2017)).  Despite Plaintiff's allegations to the contrary (Pl. Br. at 17), the ALJ did both here.  For example, in partially discounting Plaintiff's subjective symptoms, the ALJ pointed to Plaintiff's October 6, 2014 function report form.  That form specifically asked—and Plaintiff answered—questions about not just the type, but also the extent of his daily activities. (Tr. at 15, 18, 230-237.)

The form asked Plaintiff "what [do] you do <u>from the time you wake up until going to bed[?]</u>"  (Tr. 230 (emphasis added).)   Plaintiff responded that he "[h]elp[ed] with general household and yard chores, and look[ed] for work." (<u>Id.</u>)  Plaintiff also "bathe[d] and help[ed]

his mother." (Tr. at 231.) Plaintiff also indicated that he took care of his mother by helping her around the house. (Tr. at 231; see also Tr. at 351 (10/8/15) (reporting to family nurse practitioner that Plaintiff is the "[s]ole caregiver for his mother").) Plaintiff indicated that he did some cleaning, laundry, light repair work, took out the trash, and light yard work, and that he did these things "when needed." (Tr. at 232 (emphasis added).) He stated he went outside and walked, drove, or rode in a car "several times a day" and that he shopped "when needed" which was "usually" "once a week for about 1 to 2 hours." (Tr. at 233 (emphasis added).) Plaintiff also indicated that he had no problem with personal care, that he could "daily" prepare "sandwiches and snacks," that he could not "hold utensils for long periods of time," and that he could handle his own money, pay attention for as long as needed, spend time with family "once or twice a week," and complete what he started. (Tr. 231-232, 234-235 (emphasis added).) Plaintiff also alleged that he could not lift more than five pounds, or stand for long periods of time, or walk more than fifteen minutes without resting, climb "lots" of stairs, or grasp and hold things. (Tr. at 235.) The ALJ also pointed to the report of a family nurse practitioner in which Plaintiff stated that he was walking and running to lose weight, though it increased his knee pain. (Tr. 17-18, 324.) At that examination, Plaintiff's gait and posture were normal and his range of motion in his knees was not inhibited despite his "subjective pain." (Tr. at 325.) The ALJ reconciled and summarized this information by stating that Plaintiff reported that he could perform household chores, walk for exercise, work in the yard, look for work, prepare simple meals, wash laundry, do light repair work, drive, shop, handle his own money, pay attention, spend time with family and friends, and complete what he

started. (Tr. 15, 18.) These activities are inconsistent with Plaintiff's allegations of complete disability.[10]

Plaintiff's arguments to the contrary are not persuasive. Plaintiff points to a November 7, 2014 report filed by his mother. (Pl. Br. at 15-17 referencing Tr. at 197-204.) The ALJ considered that report and stated the following:

> The undersigned next considered the third party function report of Margaret Brownlee, the claimant's mother (Exhibit 1E). Ms. Brownlee lives with the claimant and is familiar with his daily routines and [h]is conditions from [a] non-medical perspective, but her opinion is based on his symptoms as he subjectively portrays them. Further, based on her relationship with the claimant, Ms. Brownlee cannot be considered an independent third-party witness. Therefore, the undersigned gave this opinion little weight.

(Tr. at 18.) Plaintiff contends that the ALJ erred in making this assessment because Ms. Brownlee lived with Plaintiff and could make her assessment based on her objective observations, and because it should not be assumed that she cannot be considered an independent third party witness. (Pl. Br. at 15-17.) However, the ALJ acknowledged that Ms. Brownlee lived with Plaintiff and was familiar with his daily routines. Nevertheless, the ALJ found that her observations were still based on Plaintiff's symptoms as he subjectively portrays them (Tr. at 18). Thus, the reasons the ALJ provided for partially discounting Plaintiff's allegations of symptom severity are equally applicable to his mother's assertions of his symptom severity. In addition, the ALJ accurately noted that Ms. Brownlee provided her account from a "non-medical" perspective, and the ALJ accurately observed that Ms.

---

[10] As discussed above, the ALJ also relied on the medical evidence and opinion evidence in reaching the RFC determination in this case, including the opinions of the state agency physicians, who specifically concluded that Plaintiff could lift and/or carry 20 pounds for up to 1/3 of an 8-hour day, could lift and/or carry 10 pounds between 1/3 and 2/3 of an 8-hour day, and could stand and/or walk for 6 hours in an 8-hour workday. (Tr. at 18, 62, 73.)

Brownlee was not an independent third-party witness, by virtue of her relationship with Plaintiff. Taken as a whole, the Court does not find error in the ALJ's explanation.[11]

Plaintiff also faults the ALJ for finding his subjective complaints somewhat less persuasive because he looked for work during the alleged period of disability. (Pl. Br. at 17.) However, even if Plaintiff only looked for work for two months, as he alleges, it was not unreasonable for the ALJ to rely upon this, as one factor of many, to conclude that Plaintiff was capable of sustaining work despite his allegations of disabling limitations.

Finally, Plaintiff contends that the ALJ erred by noting that he only takes over-the-counter medication for his pain, without discussing evidence that at different times he took ibuprofen, meloxicam, and Aleve that only "dulled" his pain, and without discussing an April 2017 treatment note which states that he was not taking Primidone for his tremors due to a lack of insurance. (Pl. Br. at 18 citing Tr. at 293, 299, 376, 377). However, the ALJ accurately noted that Plaintiff testified at the time of his administrative hearing that he currently only took "over-the-counter medication for pain." (Tr. at 18, 39.) Moreover, the ALJ did mention the fact that Plaintiff previously tried anti-inflammatory medication and meloxicam (Tr. at 17-18, 293, 295, 299), and the ALJ noted that the medical records reflected that "ibuprofen helped somewhat" (Tr. at 17), that the "orthopedist recommended a stronger anti-inflammatory" (Tr.

---

[11] Moreover, even if the Court were to agree with Plaintiff that the ALJ erred in evaluating this report, any error would be harmless, since the reasons the ALJ provided for partially discounting Plaintiff's allegations of symptom severity are equally applicable to his mother's assertions of his symptom severity. This approach has been consistently adopted by judges in this district and elsewhere. See, e.g., Long v. Colvin, No. 1:13CV659, 2015 WL 1646985, at *2 (M.D.N.C. Apr. 14, 2015) (Osteen, J.) ("The evidence [in the third-party function report] was cumulative in nature and did not require additional explanation within the ALJ's decision."); Blackwell v. Colvin, No. 1:14CV85, 2014 WL 7339132 (W.D.N.C. Dec. 23, 2014); Davenport v. Colvin, No. CV 0:15-1906-MGL-PJG, 2016 WL 3883190, at *10 (D.S.C. June 15, 2016); Marshall v. Colvin, 2015 WL 5970435 (M.D.N.C. Oct. 14, 2015); Dyrda v. Colvin, 47 F. Supp. 3d 318, 327 (M.D.N.C. 2014); Belton v. Colvin, No. 1:14CV777, 2015 WL 5023087, at *8 (M.D.N.C. Aug. 24, 2015).

at 18), and that "Meloxicam helped but did not completely resolve the pain" (Tr. at 18.) Finally, the ALJ did not discount Plaintiff's subjective complaints for failing to use Primidone. Thus, the Court finds no error in the ALJ's consideration of the evidence regarding Plaintiff's medication and treatment history.

Ultimately, the ALJ made a determination regarding Plaintiff's symptoms after considering Plaintiff's testimony and the applicable factors at length. The ALJ's discussion clearly takes into account Plaintiff's "medical history, medical signs, and laboratory findings" as well as the factors set out in 20 C.F.R. § 404.1529(c)(3), such as the extent of Plaintiff's treatments and his daily activities. Plaintiff has not shown how this symptom evaluation was improper or how the ALJ's determination was unsupported by substantial evidence.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #9] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #11] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 16th day of August, 2019.

            /s/ Joi Elizabeth Peake
          United States Magistrate Judge